**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION**

| | |
|---|---|
| RYAN SMITH, derivatively on behalf of ORTHOFIX MEDICAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KEITH VALENTINE, JOHN BOSTJANCIC, and PATRICK KERAN,<br><br>Defendants,<br><br>and<br><br>ORTHOFIX MEDICAL, INC.,<br><br>Nominal Defendant. | Case No.<br><br>JURY TRIAL DEMANDED |

**ORIGINAL VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

TO THE UNITED STATES DISTRICT COURT JUDGE, JUDGE PRESIDING:

Plaintiff Ryan Smith ("Plaintiff"), by and through his undersigned counsel, hereby submits this Original Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Orthofix Medical, Inc. ("Orthofix" or the "Company"), against certain current and former officers and directors of the Company seeking to remedy breaches of fiduciary duties and unjust enrichment, and violations of federal law. Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: (a) public filings made by Orthofix and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by certain of the defendants and other non-parties; (c) news

articles, shareholder communications and postings on Orthofix's website; (d) publicly available filings in the related securities fraud class action lawsuit captioned *In re Orthofix Medical, Inc. Sec. Litig.*, Master File No. 2:24-cv-00690, pending in this Court (the "Securities Action"); and (e) other publicly available information concerning Orthofix and the Individual Defendants (defined below under "Parties"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. Orthofix, a Delaware corporation headquartered in Lewisville, Texas, is a publicly traded global spine and orthopedics company that offers biologics, spinal hardware, bone growth therapies, and specialized orthopedic solutions, among other things, to healthcare professionals throughout the world.

2. When Orthofix announced on October 11, 2022 that it had entered into a definitive agreement (the "Merger Agreement") to combine in an all-stock merger of equals with SeaSpine Holdings Corp. ("SeaSpine"), a California-based global medical technology company focused on surgical solutions for the treatment of spinal disorders, (the "Merger"), stockholders and the market reacted favorably.

3. According to the Company's press release announcing the Merger (which was filed with the SEC) and a corresponding conference call with analysts and stockholders, defendant Keith Valentine ("Valentine"), SeaSpine's then-President and Chief Executive Officer ("CEO") and a well-known figure in the medical devices world, would serve as President and CEO of Orthofix following the Merger, and would also be appointed to serve on the Company's Board of Directors (the "Board"). The Merger Agreement, which was attached to the corresponding SEC Form 8-K, included representations regarding the absence of harassing and

discriminatory misconduct and related formal and informal complaints or settlements at SeaSpine in the previous four years.

4. In the following month, Orthofix and SeaSpine announced that after a purported evaluation process, it was determined that effective upon the completion of the Merger, defendant Valentine's close personal friends and fellow top SeaSpine executives would join the ranks of the combined Company's leadership: defendant John Bostjancic ("Bostjancic"), SeaSpine's then-Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), would serve as CFO of Orthofix; and defendant Patrick Keran ("Keran"), SeaSpine's then-Senior Vice President ("SVP") and General Counsel ("GC"), would serve as Orthofix's Chief Legal Officer ("CLO").[1]

5. In addition, in soliciting stockholder votes through an S-4 registration statement (inclusive of amendments thereto and documents incorporated therein, the "Registration Statement") and the related joint proxy statement/424B3 prospectus (inclusive of amendments thereto, related prospectuses, and documents incorporated therein, the "Joint Proxy Statement/Prospectus) (collectively, the "Offering Documents"), Orthofix and SeaSpine again attached the Merger Agreement which included representations attesting to the absence of harassing and discriminatory misconduct and related formal and informal complaints or settlements at SeaSpine in the past four years.

6. Less than three months after the announcement of the Merger Agreement, in January 2023, Orthofix solicited and exchanged 16 million new shares of Orthofix common stock directly to former shareholders of SeaSpine as follows: each former share of SeaSpine

---

[1] Defendants Valentine, Bostjancic, and Keran are together referred to herein as the "Individual Defendants".

common stock was exchanged for 0.4163 shares of newly issued Orthofix common stock (and, if applicable, cash in lieu of fractional shares). All these new shares of Orthofix common stock were registered, solicited, and exchanged pursuant to the Offering Documents.

7. On January 4, 2023, Orthofix and SeaSpine announced the successful completion of the Merger, which became effective as of 12:01 AM EST on January 5, 2023.

8. From October 11, 2022 (the day the Merger Agreement was announced) through September 12, 2023 (the "Relevant Period"), a series of public statements was issued to stockholders which failed to disclose adverse facts relating to the extent of discrimination and misconduct that had been occurring at SeaSpine for years, and the roles that the Individual Defendants, part of the promised leadership team, played in fostering SeaSpine's hostile and misogynistic workplace -- information which was readily available to Orthofix during the due diligence process. Further, materially false and misleading statements were also made to stockholders about the purported robustness of Orthofix's ethics and compliance program, which in reality was grossly deficient.

9. Separately, the Offering Documents contained untrue statements of material fact and omitted material facts, both required by governing regulations, necessary to make the statements made not misleading. These false statements included a series of representations touting SeaSpine's and Orthofix's complementary cultures of integrity as a basis for the Merger and attesting to the absence of workplace misconduct at SeaSpine.

10. In truth, leading up to and throughout the Relevant Period, the Individual Defendants' severe misconduct that was concealed from stockholders posed a material risk to Orthofix as the Individual Defendants were installed to lead the post-Merger Company. Further, SeaSpine had a long-standing history of workplace discrimination and other forms of misconduct

that belied the public statements issued to stockholders during the Relevant Period and in the Offering Documents.

11. In reality, for years, the Individual Defendants, with defendant Valentine as their ringleader, engendered a "good old boys' club" culture at SeaSpine in which female employees were the targets of harassment, were paid less for equal work, and were silenced—and sometimes fired—when they tried to raise concerns. The situation at SeaSpine was so egregious that a former SeaSpine employee filed a lawsuit in California state court against SeaSpine alleging systemic gender discrimination, captioned *Johnson v. SeaSpine Holdings Corp.,* Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty) (the "*Johnson* Action"). The California state court approved a class action settlement in the *Johnson* Action as recently as July 2021, which resulted in funds being disbursed to over 270 class members and required SeaSpine to undergo an overhaul to its compensation and job titling structures and parity pay analysis. All this information was readily available to Orthofix during the due diligence period, which should have prompted further investigation.

12. In fact, during the due diligence period and leading up to the Merger, the Individual Defendants engaged in acts of "moral turpitude" (as eventually stated by the Board and confirmed by a neutral arbitrator), including exchanging improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace. But the careless approach at Orthofix to conducting due diligence on human resources ("HR") and personnel issues was rooted in an existing cultural indifference at the Company to those issues. Indeed, Orthofix too had a history of sex-based discrimination and harassment with a non-functional HR department. For example, Orthofix was the defendant in a lawsuit brought by a woman named Kathryn Boston ("Ms. Boston") in June 2016 that resulted

from Ms. Boston being sexually harassed and assaulted by a surgeon while marketing Orthofix products. In her amended complaint, Ms. Boston alleged the then-President of Orthofix Spine did not investigate her internal complaint.

13. When the Individual Defendants took over at Orthofix, they brought with them their problematic management style, continuing to devalue and discriminate against women, even in light of the problems that had been raised during the discrimination class action lawsuit (the *Johnson* Action). But eventually, Orthofix's Board could not continue to turn a blind eye. On September 12, 2023, the risk to the Company's business posed by the Individual Defendants before the Merger, which was entirely foreseeable, materialized: Orthofix publicly disclosed that the Individual Defendants had been terminated "for cause" following an internal investigation which uncovered that they "violated multiple code of conduct requirements," sharing with stockholders for the first time the egregious behavior of the Individual Defendants, involving "harassing [and] inappropriate conduct [and] statements." The Board considered the Individual Defendants' conduct from before as well as after the Merger in reaching its decision.

14. When the Individual Defendants' "for cause" terminations were disclosed publicly on September 12, 2023, the price of Orthofix common stock plummeted by more than ***30%***, wiping out $206.5 million of market capitalization.

15. As a result of these events, the Securities Action was initiated against the Company in this Court in August 2024. The plaintiffs to the Securities Action would go on to file their First Amended Consolidated Complaint for Violations of the Federal Securities Laws (the "First Securities Complaint") on April 17, 2025. The First Securities Complaint asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a class of investors who acquired or purchased Orthofix shares during the "Class

Period" of October 11, 2022 through September 12, 2023, and claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all former SeaSpine shareholders who acquired newly-issued Orthofix common stock pursuant to the Offering Documents issued in connection with the Merger. The allegations in the First Securities Complaint were based in part on detailed accounts provided by a number of confidential witnesses ("CWs"), described therein as former Orthofix and/or SeaSpine employees.

16. The defendants to the Securities Action subsequently moved to dismiss the First Securities Complaint. On March 9, 2026, however, U.S. District Judge Rodney Gilstrap ("Judge Gilstrap") denied the defendants' motions to dismiss in part. Specifically, Judge Gilstrap concluded that the Securities Act claims had been sufficiently alleged by the plaintiffs, to the extent they were based on a category of statements challenged in the First Securities Complaint which the parties to the Securities Action (and the Court) characterized as "Type 2" statements.

17. The "Type 2" statements challenged in the First Securities Complaint, which served as the basis for the sustained Securities Act claims, are described in Judge Gilstrap's March 9, 2026 Memorandum Opinion and Order as follows:

> Statement Type 2. The merger prospectus included as an appendix the merger agreement between Orthofix and SeaSpine. (Dkt. No. 50 at 8-9.) Plaintiffs challenge representations and warranties about employment matters that SeaSpine made to Orthofix in the merger agreement, including that "[w]ithin the past four (4) years, SeaSpine has not entered into any settlement agreement" pertaining to misconduct allegations. (*Id*. at 9, citing Dkt. No. 49 at 88.) Defendants note that the merger agreement "stated that the representations and warranties were qualified by materiality thresholds and a 'confidential disclosure letter delivered by SeaSpine.'" (Dkt. No. 50 at 9, citing Dkt. No. 50-8 at A-20.)

18. "Statement Type 2", per Judge Gilstrap's opinion denying defendants' motions to dismiss (in part), was "***clearly a misrepresentation***, as it was made less than four years from the 2021 settlement of the Johnson Action." Although Judge Gilstrap only sustained the Securities

Act claims in the First Securities Complaint (in part), notably, Judge Gilstrap opined that this "clear misrepresentation" could also serve as the basis for securities fraud claims under the Exchange Act: "Statement Type 2 is a material misrepresentation which can support [] Section 10(b), SEC Rule 10b-5, Section 11, or Section 12(a)(2) claims at this stage of the litigation."

19. Although Judge Gilstrap only sustained the First Securities Complaint in part, Judge Gilstrap granted the plaintiffs leave to file an amended pleading. Accordingly, on April 8, 2026, the plaintiffs to the Securities Action filed their Second Amended Consolidated Complaint for Violation of the Federal Securities Laws (the "Second Securities Complaint"), which remains the operative pleading in that case. The Second Securities Complaint asserts claims under the Exchange Act on behalf of a class of investors who acquired or purchased Orthofix shares during the Class Period, and claims under the Securities Act on behalf of all former SeaSpine shareholders who acquired newly-issued Orthofix common stock pursuant to the Offering Documents issued in connection with the Merger. The allegations in the Second Securities Complaint are based in part on detailed accounts provided by CWs, described therein as former Orthofix and/or SeaSpine employees.[2] The Securities Action remains pending.

20. On July 31, 2025 -- before the Securities Action was sustained (in part) -- Plaintiff issued a formal, written pre-suit demand to the Board under Delaware law (the "Demand"), a true and correct copy of which is attached hereto at Exhibit A. Therein, Plaintiff demanded that the Board undertake an independent, good faith investigation and take action on behalf of the Company against twelve (12) current and former directors and/or officers of Orthofix (collectively referred to in the Litigation Demand as "Management"), including the three Individual Defendants (Valentine, Bostjancic, and Keran), and hold all such individuals to

---

[2] Certain of the CW accounts in the Second Securities Complaint are referenced herein.

account for the damages their fiduciary failures and other serious misconduct caused the Company and/or exposed the Company to.[3]

21. Counsel for Orthofix and/or the Board, Potter Anderson & Corroon LLP ("Potter Anderson"), thereafter sent a letter dated September 2, 2025 to counsel for Plaintiff, a true and correct copy of which is attached here to at Exhibit B. Therein, Potter Anderson advised that in connection with an earlier-issued, substantially similar stockholder demand, the Board had determined to defer a decision based on the pendency of the Securities Action and related shareholder derivative litigation (which had been initiated by stockholders that, unlike Plaintiff, did not make pre-suit demands as required by Delaware law). Potter Anderson further advised that the Board had formed a committee (the "Committee") which had been authorized to monitor developments in the Securities Action and derivative litigation. Potter Anderson informed Plaintiff that the Committee had determined not to undertake an investigation at that time given those pending matters but would continue to monitor those proceedings and "will take any action it determines to be necessary or appropriate to safeguard the rights and interests of the Company and its stockholders as those matters proceed." *See* Exhibit B.

22. After hearing nothing further from Potter Anderson over the next eight months, on June 1, 2026 – after the Securities Action was sustained (in part), and after the filing of the Second Securities Complaint -- counsel for Plaintiff sent an email to Potter Anderson, a true and correct copy of which is attached hereto at Exhibit C, stating that the applicable statute of

---

[3] Per the Demand, the individuals alleged to have engaged in wrongdoing therein by Plaintiff and identified as "Management" were as follows: defendant Valentine, defendant Bostjancic, defendant Keran, Jon C. Serbousek ("Mr. Serbousek"), Douglas C. Rice ("Mr. Rice"), Catherine M. Burzik ("Ms. Burzik"), James F. Hinrichs ("Mr. Hinrichs"), Lilly Marks ("Ms. Marks"), John E. Sicard ("Mr. Sicard"), Thomas A. West ("Mr. West"), Kimberley A. Elting ("Ms. Elting"), and Stuart Essig ("Mr. Essig").

limitations for the Company's breach of fiduciary duty claims under Delaware law at least arguably was set to expire on September 12, 2026 (three years after September 12, 2023, the date the Individual Defendants' "for cause" terminations were disclosed publicly). Accordingly, given the Board's and/or the Committee's indefinite deferral of any investigation or decision in connection with Plaintiff's Demand, counsel for Plaintiff advised that the Board was duty-bound to secure tolling agreements with each of the twelve individuals that had been identified in the Demand as "Management", so as to ensure that the Company's valuable claims against all those individuals accused of wrongdoing would be preserved. *See* Exhibit C.

23. On June 8, 2026, Potter Anderson sent a letter in response to counsel for Plaintiff, a true and correct copy of which is attached hereto at Exhibit D. Therein, Potter Anderson advised that tolling agreements had been secured as to only nine of the individuals identified as "Management" in the Demand -- Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Hinrichs, Ms. Marks, Mr. Sicard, Mr. West, Ms. Elting, and Mr. Essig. ***The remaining three individuals – Valentine, Bostjancic, and Keran – had "declined to sign a tolling agreement"***. *See* Exhibit D.

24. In response to a pre-suit demand, directors of a Delaware corporation must promptly investigate and evaluate the charges to discharge their duties to shareholders and manage corporate affairs responsibly. The directors must conduct an objective and thorough investigation. Directors are fiduciaries, and thus they are duty-bound to inform themselves properly before making business decisions.

25. Indeed, where a board rejects a shareholder demand, the only issue subject to challenge is the good faith and reasonableness of the board's investigation. Although there is no prescribed procedure that a board must follow, and directors need not show that they performed a perfect investigation, the process must be sufficient for a court to conclude confidently that it

reflects an earnest attempt to investigate a shareholder's complaint. Business judgment protection does not apply where a board's "review" of a demand effectively constitutes a pretext or sham.

26. Further, claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Orthofix, ***are duty-bound at all times to protect and preserve the corporation's assets***.

27. Here, even though (a) the three Individual Defendants, unlike all of the other individuals identified as "Management" in the Demand, "declined to sign a tolling agreement", and (b) Potter Anderson assured Plaintiff shortly after the Demand was issued that the Board and/or the Committee, notwithstanding their indefinite deferral of the Demand, would act "to safeguard the rights and interests of the Company and its stockholders", the Board and/or the Committee have inexplicably disregarded their fiduciary duties to protect and preserve Orthofix's valuable corporate assets and chosen to do ***absolutely nothing*** as the expiration of the applicable statute of limitations for claims against those individuals has rapidly approached.

28. This amounts to a constructive, wrongful refusal of Plaintiff's Demand (at least to the extent that Plaintiff demanded therein that the Board take action on behalf of Orthofix against the three Individual Defendants), and the failure to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Orthofix and its stockholders.

29. The Board's dereliction of duty has left Plaintiff with no choice but to initiate this derivative action at this time against the three Individual Defendants, who each "declined to sign a tolling agreement", to ensure that the Company's valuable claims for relief based on the

allegations in the Demand are properly and timely asserted.[4] Accordingly, this derivative action should proceed.

**JURISDICTION AND VENUE**

30. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Exchange Act. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

31. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

32. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Company maintains its principal place of business in this District, one or more of the defendants either resides, or maintains offices, in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violations of fiduciary duties owed to the Company occurred in this District and Division, and Individual Defendants have received substantial compensation in this District and Division by doing business here and engaging in numerous activities that had an

[4] Plaintiff has not asserted claims at this time against the other nine members of "Management" identified in the Demand (Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Hinrichs, Ms. Marks, Mr. Sicard, Mr. West, Ms. Elting, and Mr. Essig), given those individuals signed tolling agreements, but Plaintiff expressly reserves the right to do so in an amended pleading should circumstances warrant it.

effect in this district.

33. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

34. Plaintiff is a current shareholder of Orthofix and has continuously held Orthofix common stock since September 2022.

35. Nominal defendant Orthofix is incorporated under the laws of Delaware, with its principal executive offices in Lewisville, Texas. Orthofix's common stock trades on the NASDAQ Exchange under the ticker symbol "OFIX."

36. Defendant Valentine served as the Company's President and CEO upon the completion of the Merger and at all relevant times thereafter, his employment was terminated "for cause" in September 2023. Defendant Valentine was formerly SeaSpine's President, CEO, and a member of its Board until the Merger. Defendant Valentine is a named individual defendant in the (partially) sustained Securities Action.

37. Defendant Bostjancic served as the Company's CFO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. Defendant Bostjancic was formerly the CFO, Treasurer, and SVP at SeaSpine until the Merger. Defendant Bostjancic is a named individual defendant in the (partially) sustained Securities Action.

38. Defendant Keran served as the Company's CLO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in

September 2023. Defendant Keran was formerly SeaSpine's SVP, GC, and Secretary until the Merger. Defendant Keran is a named individual defendant in the (partially) sustained Securities Action.

39. Defendants Valentine, Bostjancic, and Keran are referred to herein as the "Individual Defendants."

**INDIVIDUAL DEFENDANTS' DUTIES**

40. By reason of their positions as officers, directors, and/or fiduciaries of Orthofix, and because of their ability to control the business and corporate affairs of Orthofix, Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Orthofix in a fair, just, honest and equitable manner.

41. Further, Individual Defendants were, and are, required to act in furtherance of the best interests of Orthofix and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit. Each director and officer of the Company owes to Orthofix and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

42. Because of their positions of control and authority as directors and/or officers of Orthofix, having knowledge of material non-public information regarding the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Orthofix were required to exercise reasonable and prudent supervision over the management,

policies, practices and controls of the Company. By virtue of such duties the officers and directors of Orthofix were required to, among other things:

1. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

2. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

3. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### A. Prior to the Merger, Stockholders Are Told That Misconduct at SeaSpine Does Not Exist

43. Orthofix describes itself as a leading global spine and orthopedics company with a comprehensive portfolio of biologics, innovative spinal hardware, bone growth therapies, specialized orthopedic solutions, and a leading surgical navigation system. It has been recognized as the eighth largest orthopedic medical device company in the world. Founded in Verona, Italy and incorporated under Delaware law, Orthofix's medical device company is headquartered in Lewisville, Texas, where it conducts general business, product development, medical education, and manufacturing.

44. On October 11, 2022, Orthofix and SeaSpine—both medical device companies focused on orthopedic and spinal treatments—announced a "merger of equals." SeaSpine's senior executives were slated to lead the combined Company. Defendant Valentine, then SeaSpine's President, CEO, and a director, would assume those same roles at the merged Orthofix. Defendants Bostjancic and Keran, also SeaSpine senior executives, would serve as CFO and CLO, respectively.

45. That same day, Orthofix filed a Form 8-K with the SEC attaching the Merger Agreement and encouraging stockholders to "read the merger agreement carefully and in its entirety, as it is the legal document that governs the merger." The Merger Agreement included representations on matters deemed essential to the Merger, including the following representations ("Merger Representations").

46. First, stockholders were assured that SeaSpine was in compliance with all laws relating to the employment of labor, including laws relating to "harassment, discrimination and/or retaliation in employment," as well as "pay equity" and "employment equity." Second, that assurance of compliance was paired with a series of categorical denials about misconduct by SeaSpine's officers, directors, managers, or supervisory-level employees:

- "No . . . Misconduct Allegation . . . has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine";

- "[N]or are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened";

- "[N]or is there any reasonable basis for such a Misconduct Allegation;" and "No . . . Misconduct Allegation . . . has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine";

- “[N]or are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened”; and

- “[N]or is there any reasonable basis for such a Misconduct Allegation.”

47. “Misconduct Allegation” was defined broadly to encompass any “allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior.”

**B. In Truth, SeaSpine’s Top Executives Had Long Perpetuated a Culture of Serious Workplace Misconduct**

48. Each of the above Merger Representations were false. While managing SeaSpine, a predominantly male-led company, the three Individual Defendants fostered a longstanding culture of discrimination, harassment, bullying, excessive drinking, and other workplace misconduct. Their personal misconduct—and their perpetuation of it at both SeaSpine and Orthofix -- is well-documented in the *Johnson* Action, the action brought by Ms. Boston, the findings by Orthofix’s own Board following an internal investigation, and in the (partially) sustained Securities Action. Indeed, this serious misconduct is corroborated by detailed accounts in the operative, pending Second Securities Complaint provided by several CWs who worked at SeaSpine or Orthofix (or both) between 2012 and 2024.

49. According to the CW accounts in the Second Securities Complaint, since at least 2015, the Individual Defendants are alleged to have cultivated a “good old boys’ club” culture at SeaSpine that promoted discriminatory hiring, promotion, and compensation practices, widespread harassment and abusive language, and active efforts to conceal these practices and obstruct accountability.

50. It is alleged in the Second Securities Complaint, per the CW accounts, that to shield their misconduct, the Individual Defendants maintained ultimate control over SeaSpine’s

HR department and its investigations, blocking independent inquiries and deterring employees from raising complaints. Defendants Valentine and Keran are alleged to have refused to permit HR to conduct any investigation without their sign-off. The frustration this caused was evident: SeaSpine cycled through eight Vice Presidents of HR in just three years.

51. With HR neutralized, the Individual Defendants engaged in misconduct unchecked. As alleged in detail in the Second Securities Complaint, per CW accounts, the Individual Defendants pursued "inappropriate relationships" with their executive assistants ("EAs") and fostered a culture of bullying among female employees led by those same EAs.

52. In 2017, former HR employee Maryanne Johnson ("Ms. Johnson") filed the *Johnson* Action in California state court, alleging that SeaSpine systematically paid women less than men for the same work. The *Johnson* Action also alleged that SeaSpine actively concealed its discriminatory compensation practices by creating more than 200 job titles for only 300 employees -- a structure designed to mask pay inequities for employees performing the same work. Ms. Johnson's allegations and the detailed, corroborating accounts of the CWs in the Second Securities Complaint have confirmed that discrimination and harassment complaints went unaddressed.

53. In 2021, the *Johnson* Action settled for nearly $1 million on behalf of a class of 276 current and former female SeaSpine employees in California. The settlement of the *Johnson* Action also required SeaSpine to hire an outside vendor to review its practices, identify pay inequities, and remediate the discrimination. But SeaSpine did not comply with this requirement. According to the account of the CW referred to in the Second Securities Complaint as "CW 4" and described as a former Vice President of HR, SeaSpine's employment data was deliberately

altered to make the company appear more equitable, and that falsified data was provided to the outside vendor.

54. The hostile work environment prompted additional legal action. Catherine O'Connor ("Ms. O'Connor"), who worked as a SeaSpine attorney from 2018 to 2024, sued SeaSpine and Orthofix after the Merger, alleging sexual harassment, gender discrimination, and retaliation she experienced both before and after the transaction. Ms. O'Connor alleged that when she worked with defendant Keran to negotiate her salary, the Individual Defendants dismissed her request for equitable pay. As alleged in the Second Securities Complaint, text messages between defendants Bostjancic and Keran discussing Ms. O'Connor's salary request revealed their demeaning attitudes. Despite this ongoing misconduct, the Individual Defendants presented a contrary image of the Company to stockholders during the Relevant Period.

**B. The Individual Defendants Are Terminated for the Very Misconduct Stockholders Were Previously Told Was Non-Existent**

55. On January 4, 2023, Orthofix and SeaSpine completed the Merger. The Individual Defendants assumed control of the combined Company and continued the discriminatory culture they had fostered at SeaSpine. Accordingly, as alleged in the Securities Action, six months later, Orthofix's Board received a complaint from the President of Orthofix Global Spine detailing multiple instances of workplace misconduct by the Individual Defendants -- including harassment of employees, disregard of compliance obligations, overconsumption of alcohol, and regular inappropriate comments.

56. As alleged in the Securities Action, the Board retained outside counsel to conduct an internal investigation. In mid-August 2023, the Board asked the Individual Defendants to

surrender their phones for imaging. The internal investigation examined misconduct occurring both before and after the Merger, reaching back to at least 2021.[5]

57. The internal investigation confirmed that the Individual Defendants had engaged in harassment and other workplace misconduct both before and after the Merger. Per the Burzik Declaration, the Board found evidence that the Individual Defendants: (1) "repeatedly made gross and improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace," (2) "engaged in significant and repeated bullying and other mistreatment of Orthofix's employees," (3) "demeaned and devalued the contributions of female employees," and (4) "acted frequently with aggression, and accepted and promoted vulgarity and personal attacks."

58. As alleged in the Securities Action, on September 11, 2023, Orthofix sent notices of termination "for cause" to defendants Valentine and Keran, and to defendant Bostjancic the next day, stating that they had repeatedly made comments about female co-workers and others that were "racist," "sexual," "crude," and "inappropriate." Evidence supporting the Board's decision included "highly offensive text messages." The termination notices concluded that the Individual Defendants: (a) engaged in "acts of moral turpitude"; (b) "committed willful misconduct" that "caused material and demonstrable injury to the Company"; (c) "committed willful and material violations of applicable Company policies and codes of conduct"; and (d) "engaged in breaches of fiduciary duty" in connection with their service as directors of Orthofix

---

[5] Information regarding the Company's internal investigation was made available to the public in litigation filed in California state court by the Individual Defendants against Orthofix and its Board following the Individual Defendants' terminations, captioned *Valentine, et al. v. Burzik, et al.*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty) (the "Defamation Action"). In particular, in the Defamation Action, Orthofix Board members filed a Special Motion to Strike the Individual Defendants' complaint, accompanied by a sworn declaration (the "Burzik Declaration") from Ms. Burzik, the former Chair of the Board.

and SeaSpine. The Burzik Declaration put it bluntly: the Individual Defendants' "workplace conduct" made it "untenable for them to remain as high officers in a public company."

### D. Following the Announcement of the Individual Defendants' "For Cause" Terminations, the Company's Stock Price Immediately Plummets

59. On September 12, 2023—less than nine months after the Merger closed—Orthofix issued a press release announcing that the Board's independent directors had unanimously decided to terminate the Individual Defendants "for cause." The press release explained that the terminations resulted from an internal investigation revealing that the Individual Defendants "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." Ms. Burzik, who was then serving as Chair of the Board, stated, "we do not condone harassing or inappropriate conduct or statements of any kind" and represented that the terminations were "necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders."

60. Two days later, on September 14, 2023, Orthofix confirmed in a Current Report on Form 8-K filed with the SEC that the Individual Defendants' terminations "for cause" meant the Company owed no severance or other payments to the Individual Defendants (together with the press release, the "Termination Announcement").

61. Stockholders and the market reacted immediately. Within five minutes of the 7:03 AM press release on September 12, 2023, *MarketWatch* reported that Orthofix's "stock tumble[d] 11.3% premarket after CEO, CFO, and CLO terminated for cause." When the market opened at 9:30 AM, *Bloomberg* reported that Orthofix's stock price had declined by 22%—the largest drop in 15 years—making it the worst-performing stock among its peers, even before any

analyst reports were issued. In fact, no analyst downgraded the Company's stock or issued a report until around three hours after the press release when the stock price had already tumbled. By market close, Orthofix's stock had plunged ***30%*** on unusually heavy erasing $206.5 million in market capitalization.

62. The following day, media coverage emphasized that Orthofix suffered ***its worst trading day in nearly 30 years*** after the Individual Defendants were fired for "offensive conduct."

63. Analysts and news articles uniformly linked the Board's findings of misconduct to the Individual Defendants' terminations and the resulting stock collapse. For instance, BTIG reported that stockholders were "surprised" by the "sudden leadership change" resulting from the Individual Defendants' terminations "for cause" due to code of conduct violations, quoting Orthofix's press release. JMP reported that the Individual Defendants' terminations resulted from "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements," remarking that its analysts had never seen a situation like this. Ladenburg Thalmann reported that Orthofix's "significant leadership changes" resulted from the terminations after the Board determined that "each of the [Individual Defendants] engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements."

64. News articles also uniformly linked the Individual Defendants' terminations to the misconduct findings. And Orthofix itself confirmed the causal link between the Termination Announcement and the stock collapse, stating in its Quarterly Report on SEC Form 10-K for the third quarter of 2023 that "[i]mmediately following the announcement" of the Individual

Defendants' "for cause" terminations, the Company's market capitalization "decreased by approximately 30%, indicating that an impairment may exist."

**E. The Securities Action**

65. As a result of these events, the Securities Action was initiated against the Company in this Court in August 2024. The plaintiffs to the Securities Action would go on to file their First Securities Complaint on April 17, 2025. The First Securities Complaint asserted claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of a class of investors who acquired or purchased Orthofix shares during the "Class Period" of October 11, 2022 through September 12, 2023, and claims under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of all former SeaSpine shareholders who acquired newly-issued Orthofix common stock pursuant to the Offering Documents issued in connection with the Merger. The allegations in the First Securities Complaint were based in part on detailed accounts provided by CWs, described therein as former Orthofix and/or SeaSpine employees.

66. The defendants to the Securities Action subsequently moved to dismiss the First Securities Complaint. On March 9, 2026, however, Judge Gilstrap denied the defendants' motions to dismiss in part. Specifically, Judge Gilstrap concluded that the Securities Act claims had been sufficiently alleged by the plaintiffs, to the extent they were based on a category of statements challenged in the First Securities Complaint which the parties to the Securities Action (and the Court) characterized as "Type 2" statements.

67. The "Type 2" statements challenged in the First Securities Complaint, which served as the basis for the sustained Securities Act claims, are described in Judge Gilstrap's March 9, 2026 Memorandum Opinion and Order as follows:

> Statement Type 2. The merger prospectus included as an appendix the merger agreement between Orthofix and SeaSpine. (Dkt. No. 50 at 8-9.) Plaintiffs challenge representations and warranties about employment matters that SeaSpine made to Orthofix in the merger agreement, including that "[w]ithin the past four (4) years, SeaSpine has not entered into any settlement agreement" pertaining to misconduct allegations. (*Id.* at 9, citing Dkt. No. 49 at 88.) Defendants note that the merger agreement "stated that the representations and warranties were qualified by materiality thresholds and a 'confidential disclosure letter delivered by SeaSpine.'" (Dkt. No. 50 at 9, citing Dkt. No. 50-8 at A-20.)

68. "Statement Type 2", per Judge Gilstrap's opinion denying defendants' motions to dismiss (in part), was "***clearly a misrepresentation***, as it was made less than four years from the 2021 settlement of the Johnson Action." Although Judge Gilstrap only sustained the Securities Act claims in the First Securities Complaint (in part), notably, Judge Gilstrap opined that this "clear misrepresentation" could also serve as the basis for securities fraud claims under the Exchange Act: "Statement Type 2 is a material misrepresentation which can support [] Section 10(b), SEC Rule 10b-5, Section 11, or Section 12(a)(2) claims at this stage of the litigation."

69. Although Judge Gilstrap sustained the First Securities Complaint only in part, Judge Gilstrap granted the plaintiffs leave to file an amended pleading. Accordingly, on April 8, 2026, the plaintiffs to the Securities Action filed the Second Securities Complaint, which remains the operative pleading in that case. The Second Securities Complaint asserts claims under the Exchange Act on behalf of a class of investors who acquired or purchased Orthofix shares during the Class Period, and claims under the Securities Act on behalf of all former SeaSpine shareholders who acquired newly-issued Orthofix common stock pursuant to the Offering Documents issued in connection with the Merger. The allegations in the Second Securities Complaint are based in part on detailed accounts provided by CWs, described therein as former Orthofix and/or SeaSpine employees. The Securities Action remains pending.

## THE INDIVIDUAL DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS TO STOCKHOLDERS DURING THE RELEVANT PERIOD

70. As alleged herein, in breach of their non-exculpable fiduciary duties of good faith and loyalty, the Individual Defendants issued a series of materially false and misleading statements to stockholders during the Relevant Period.

71. As detailed further below, these misstatements generally concerned: (1) SeaSpine's purported compliance with employment laws, the absence of misconduct allegations or a reasonable basis for misconduct allegations at SeaSpine, and the absence of settlement agreements involving misconduct; (2) the purported performance-based culture at SeaSpine that focused on integrity, diversity, and corporate responsibility; (3) the deliberate selection of the executive leadership team and their ability to lead the successful integration of SeaSpine and Orthofix; including the selection of the Individual Defendants; (4) Orthofix's supposed implementation of a robust, comprehensive compliance and ethics program post-Merger; (5) Orthofix's purported commitment to equity and supporting women employees post-Merger; and (6) Orthofix's enforcement of corporate codes of conduct post-Merger.[6]

72. On October 11, 2022, the Individual Defendants caused Orthofix to file an SEC Form 8-K that attached and incorporated by reference the Merger Agreement. The Form 8-K included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity,***

---

[6] Plaintiff alleges that the statements in bold and italics within this Section were materially false, misleading, and/or omitted to disclose material information.

***employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

73. On November 8, 2022, the Individual Defendants caused Orthofix to file with the SEC a Draft Registration Statement on Form S-4, which, incorporating and in combination with related documents including a proxy statement and prospectus, would be used to effectuate the

Merger between Orthofix and SeaSpine with the SEC. The Form S-4 included the following false and misleading statements:

(a) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . ***The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.***

(b) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages*****,** ***hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(c) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any***

***Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(d) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine.***

74. On November 18, 2022, the Individual Defendants caused Orthofix to file with the SEC a Form 425 containing a letter sent to the Company's employees dated November 17, 2022. The Form 425 included the following false and misleading statements:

> ***ELT candidates were selected based not only on their individual merit but also with consideration for the overall composition of the executive team.*** It was critical to appoint leaders from both legacy organizations to bring forth the best of both worlds. [...] Looking ahead, there are numerous details to be worked out as part of the integration planning. We know you are eager to know who will be a part of the next level of leadership but there is still much work to be done to align our organizations as we harmonize our processes and systems. Leadership teams are continuing to work together to shape the organization to determine what is best to drive the combined company's success and ensure we are competitive. This work is ongoing and we will keep you informed as the integration progresses. For now, please focus on the great work you do and help us finish the year strong. We would like to close by saying that we are both very excited about our bright future ahead. Our new Executive

Leadership Team brings the experience and strategic vision to drive our business to new heights. Each of our leaders has shared their enthusiasm for what lies ahead, and we are confident our combined businesses will be Stronger Together!

75. That same day, on November 18, 2022, the Individual Defendants caused Orthofix to issue a press release entitled, "Orthofix and SeaSpine Announce John Bostjancic to Serve as CFO for Combined Company Post Closing." The SEC Form 8-K included the following false and misleading statements:

"John has been a key leader of SeaSpine dating back to the successful spin-out of the organization in 2015. ***I am confident his background and experience in the medical device industry coupled with his cultural influence will benefit the newly combined company as we continue to grow***," said Keith Valentine, President and CEO of SeaSpine. "I believe ***John is well positioned to help lead us through the successful integration of the two companies, ensuring accountability across all levels of the organization, as we focus on the key initiatives that will drive growth, scalability and shareholder value***."

76. On November 22, 2022, the Individual Defendants caused Orthofix to file a Form S-4/A amendment to its November 8, 2022 Registration Statement, which attached and incorporated by reference the Merger Agreement. The Form S-4/A included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***,

workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

(d) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . ***The complementary cultures of Orthofix and SeaSpine, including a strong***

***performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.***

77. On November 23, 2022, the Individual Defendants caused Orthofix to file a Joint Proxy Statement/Prospectus pursuant to Rule 424(b)(3), which incorporated by reference the Merger Agreement. The Joint Proxy Statement/Prospectus included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment***, reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

78. On March 6, 2023, the Individual Defendants caused the combined Company to file with the SEC its Annual Report on Form 10-K for the full fiscal year 2022. The 2022 Form 10-K was signed by defendants Valentine and Bostjancic, and contained the following materially false and misleading statements:

(a) ***It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program***, which is overseen by a Chief Ethics and Compliance Officer, who reports directly to our Chief Executive Officer and the Compliance Committee of the Board of Directors. ***The program is intended to promote lawful and ethical business practices throughout our domestic and international businesses. It is designed to prevent and detect violations of applicable federal, state, and local laws*** in accordance with the standards set forth in guidance issued by the U.S. Department of Justice ("U.S. DOJ") ("Evaluation of Corporate Compliance Programs" (updated June 2020)), the Office of Inspector General (HCCA-OIG "Measuring Compliance Program Effectiveness: A Resource Guide" (March 2017)), and the U.S. Sentencing Commission ("Effective Compliance and Ethics Programs" (November 2014)).

(b) ***Our key human capital objectives in managing our business include attracting, developing, and retaining top talent while integrating diversity, equity, and inclusion principles and practices into our core values.***

(c) ***We believe that success comes from investing in our people and ensuring our workforce is aligned with our mission and values***. To achieve this goal, we devote time and resources to assist our employees in being familiar with our business, industry, and product offerings. We have developed a robust onboarding program for our newly hired associates that provides a comprehensive overview of our product portfolio and company history. We put an emphasis on training our employees and sales representatives to understand our business, including the underlying medical conditions that our products treat. ***In addition, we strive to support our teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow their careers.***

(d) ***We are committed to fostering, cultivating, and preserving a culture that promotes diversity, equity, and inclusion. We seek to demonstrate our commitment to providing equal and equitable opportunities to all employees through programs*** such as our Moving 4ward initiative, a program created to embrace the value of diversity and reflect the communities where we live and work. ***Additionally, we proudly support the Orthofix Women's Network, a program that provides opportunities for women to learn from each other and grow within our company and our industry.*** Throughout the year, we promote a variety of diverse voices to our employees by recognizing events such as Black History Month, Martin Luther King Jr. Day, Women's History Month, Asian Pacific American Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage

Month. ***We seek to embrace and encourage our employees' differences and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength.*** Building on this belief, we launched companywide, and incorporated into our new hire orientation, a training titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend that by end of 2023, all hiring managers, leaders, and interviewers will have completed this training.

79. On April 27, 2023, the Individual Defendants caused Orthofix to file a Definitive Proxy Statement on Schedule 14A, which was disseminated to stockholders. The Definitive Proxy Statement included the following false and misleading statements:

(a) Corporate Governance Highlights

* * *

• ***Corporate codes of conduct enforced at all levels of the Company and its subsidiaries***

• ***Commitment to attracting, retaining, and promoting a diverse workforce through programs such as the Moving 4Ward Diversity, Equity & Inclusion Program, the Orthofix Women's Network ("OWN"), and the Orthofix Young Professionals Group***

(b) ***We maintain codes of conduct (our "Codes of Conduct") for each of our legacy Orthofix and SeaSpine businesses that are applicable to all employees worldwide of the respective business. The Code of Conduct for the legacy Orthofix business, to which all of our directors and executive officers are subject***, is available for review under the "Investors > Governance > Governance Documents" section of our website at www.orthofix.com.

***The goals of our Codes of Conduct, as well as our general corporate compliance and ethics program (which we have branded the Integrity Advantage™ Program), are to***

***deter wrongdoing and to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct. Our Codes of Conduct apply to all areas of professional conduct, including*** customer relationships, conflicts of interest, financial reporting, use of company assets, insider trading, intellectual property, confidential information, and ***workplace conduct.*** Under our Codes of Conduct, employees, directors, and executive officers are responsible for promptly reporting potential violations of any law, regulation, or our Codes of Conduct to appropriate personnel or via a hotline we have established. We intend to disclose any substantive amendment to, or a waiver from, a provision of the Code of Conduct for the legacy Orthofix business that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

(c) Our People: ***We demonstrate our commitment to providing equal and equitable opportunities to all employees through training, mentoring, education, and an inclusive culture. We engage our employees in a number of ways, including our Moving 4ward Program, which was created to improve diversity, equity and inclusion,***

***and through the Orthofix Women's Network, which strives to support the women of Orthofix around the globe in the areas of development, mentoring and engagement. Throughout the year, we promote a variety of diverse voices to our employees by*** recognizing events such as Black History Month, Martin Luther King Jr. Day, Women's History Month, Asian Pacific American Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage Month. ***We seek to embrace and encourage our employees' differences and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength.*** Building on this belief, we launched a new companywide, training titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend that by end of 2023, all hiring managers, leaders, and interviewers will have completed this training.

(d) Governance: ***It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program to promote lawful and ethical business practices throughout our domestic and international businesses*** and offer compliance training to all of our employees. Similarly, we require that our suppliers adopt sound human rights practices designed to treat workers fairly and with dignity and respect. We responsibly manage and influence the impacts of our distributors through our robust compliance and governance training***. We implement robust risk management programs to ensure compliance with applicable laws and regulations governing ethical business practices, including our relationships with suppliers, customers and business partners, and our industry.***

(e) ***Codes of Conduct: We maintain corporate codes of conduct that are applicable to all our directors, officers, and employees.*** The codes of conduct set forth our policies

and expectations on several topics, including conflicts of interest, compliance with laws, human rights, use of our assets, business conduct and fair dealing. All employees and directors participate in annual training on our corporate codes of conduct and related Company policies.

**DERIVATIVE AND WRONGFUL DEMAND REFUSAL ALLEGATIONS**

80. Plaintiff brings this action derivatively in the right and for the benefit of Orthofix to redress Individual Defendants' breaches of fiduciary duty and other violations of law.

81. Plaintiff will adequately and fairly represent the interests of Orthofix and its shareholders in enforcing and prosecuting its rights.

82. Orthofix is a Delaware corporation. It is axiomatic that the directors of a Delaware corporation owe the corporation and its stockholders "'an affirmative duty to protect the interests of the corporation.'" *Pfeiffer v. Toll*, 989 A.2d 683, 695 n.3 (Del. Ch. 2010) (quoting 1 Edward P. Welch et al., *Folk on Delaware General Corporation Law* §141.2.1.2, at GCL-IV-26 (5th ed. 2006)). Moreover, Delaware directors have "'an obligation to refrain from conduct that would injure the corporation and its stockholders.'" *Id*.

83. As the Delaware Supreme Court recognized in *Unocal Corp. v. Mesa Petroleum Co*., 493 A.2d 946, 954 (Del. 1985), the directors of a Delaware corporation must "protect the corporate enterprise . . . from harm reasonably perceived, irrespective of its source."

84. On July 31, 2025 -- before the Securities Action was sustained (in part) -- Plaintiff issued the formal, written pre-suit Demand to the Board under Delaware law. *See* Ex. A. Therein, Plaintiff demanded that the Board undertake an independent, good faith investigation and take action on behalf of the Company against twelve (12) current and former directors and/or officers of Orthofix (collectively referred to in the Demand as "Management"), including the

three Individual Defendants (Valentine, Bostjancic, and Keran), and hold such individuals to account for the damages their fiduciary failures caused the Company and/or exposed the Company to.

85. Counsel for Orthofix and/or the Board, Potter Anderson, thereafter sent a letter dated September 2, 2025 to counsel for Plaintiff. See Ex. B. Therein, Potter Anderson advised that in connection with an earlier-issued, substantially similar stockholder demand, the Board had determined to defer a decision based on the pendency of the Securities Action and related shareholder derivative litigation (which had been initiated by stockholders that, unlike Plaintiff, did not make pre-suit demands as required by Delaware law). Potter Anderson further advised that the Board had formed the Committee, which had been authorized to monitor developments in the Securities Action and derivative litigation. Potter Anderson informed Plaintiff that the Committee had determined not to undertake an investigation at that time given those pending matters, but would continue to monitor those proceedings and "will take any action it determines to be necessary or appropriate to safeguard the rights and interests of the Company and its stockholders as those matters proceed." *Id.*

86. After hearing nothing further from Potter Anderson over the next eight months, on June 1, 2026 – after the Securities Action had been sustained (in part), and after the filing of the Second Securities Complaint -- counsel for Plaintiff sent an email to Potter Anderson, stating that the applicable statute of limitations for the Company's breach of fiduciary duty claims under Delaware law at least arguably was set to expire on September 12, 2026 (three years after September 12, 2023, the date the Individual Defendants' "for cause" terminations were disclosed publicly). *See* Ex. C. Accordingly, given the Board's and/or the Committee's indefinite deferral of any investigation or decision in connection with Plaintiff's Demand, counsel for Plaintiff

advised that the Board was duty-bound to secure tolling agreements with each of the twelve individuals that had been identified in the Demand as "Management", so as to ensure that the Company's valuable claims against all those individuals accused of wrongdoing would be preserved. *Id*.

87. On June 8, 2026, Potter Anderson sent a letter in response to counsel for Plaintiff. *See* Ex. D. Therein, Potter Anderson advised that tolling agreements had been secured as to only nine of the individuals identified as "Management" in the Demand -- Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Hinrichs, Ms. Marks, Mr. Sicard, Mr. West, Ms. Elting, and Mr. Essig. ***The remaining three individuals – Valentine, Bostjancic, and Keran – had "declined to sign a tolling agreement"***. *Id*.

88. In response to a pre-suit demand, directors of a Delaware corporation must promptly investigate and evaluate the charges to discharge their duties to shareholders and manage corporate affairs responsibly. The directors must conduct an objective and thorough investigation. Directors are fiduciaries, and thus they are duty-bound to inform themselves properly before making business decisions.

89. Indeed, where a board rejects a shareholder demand, the only issue subject to challenge is the good faith and reasonableness of the board's investigation. Although there is no prescribed procedure that a board must follow, and directors need not show that they performed a perfect investigation, the process must be sufficient for a court to conclude confidently that it reflects an earnest attempt to investigate a shareholder's complaint. Business judgment protection does not apply where a board's "review" of a demand effectively constitutes a pretext or sham.

90. Further, claims for relief belonging to the Company are, of course, valuable corporate assets. Directors of Delaware corporations, such as Orthofix, ***are duty-bound at all times to protect and preserve the corporation's assets***.

91. Here, even though (a) the three Individual Defendants, unlike all of the other individuals identified as "Management" in the Demand, "declined to sign a tolling agreement", and (b) Potter Anderson assured Plaintiff shortly after the Demand was issued that the Board and/or the Committee, notwithstanding their indefinite deferral of the Demand, would act "to safeguard the rights and interests of the Company and its stockholders", the Board and/or the Committee have inexplicably disregarded their fiduciary duties to protect and preserve Orthofix's valuable corporate assets and chosen to do ***absolutely nothing*** as the expiration of the applicable statute of limitations for claims against those individuals has rapidly approached. Indeed, the claim made in September 2025 that the Board and/or Committee would act "to safeguard the rights and interests of the Company and its stockholders" has proven to have been nothing more than lip service following the Individual Defendants' brazen refusal to sign tolling agreements.

92. This amounts to a constructive, wrongful refusal of Plaintiff's Demand (at least to the extent that Plaintiff demanded therein that the Board take action on behalf of Orthofix against the three Individual Defendants), and the failure to protect and preserve the Company's corporate assets, in violation of the Board's fiduciary duties to Orthofix and its stockholders.

93. The Board's conduct is antithetical to its affirmative duty to protect the interests of Orthofix and to refrain from conduct that would injure the corporation. By failing to act upon the Demand in order "to safeguard the rights and interests of the Company and its stockholders", even after the Individual Defendants declined to enter into tolling agreements that would

preserve the Company's claims against them, the Board has failed in its "fundamental duty and obligation to protect the corporate enterprise." *Unocal*, 493 A.2d at 954. Therefore, by virtue of its own actions, the Board has refused the Demand, at least with respect to the Company's claims against the Individual Defendants. Accordingly, Plaintiff may proceed with this derivative action designed to protect the interests of Orthofix vis-à-vis the Individual Defendants by, among other things, perfecting the Company's claims for breach of fiduciary duty, unjust enrichment, contribution and indemnification, and related damages against the Individual Defendants.

94. The Board's dereliction of duty has left Plaintiff with no choice but to initiate this derivative action at this time against the three Individual Defendants, who each "declined to sign a tolling agreement", to ensure that the Company's valuable claims for relief based on the allegations in the Demand are properly and timely asserted. Accordingly, this derivative action should proceed.

**COUNT I**

**Against Individual Defendants for Breach of Fiduciary Duties**

95. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96. As alleged herein, each of the Individual Defendants violated and breached his or her fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to Orthofix shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

97. Also as alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's public statements were accurate and exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

98. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages. Thus, as a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

99. In complete abdication of their fiduciary duties, the Individual Defendants either knowingly or recklessly caused or permitted Orthofix to issue materially false and misleading statements. Specifically, the Individual Defendants caused Orthofix to issue false and misleading statements which were intended to make Orthofix appear more profitable and attractive to investors.

**COUNT II**

**Against Individual Defendants for Unjust Enrichment**

100. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101. By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Orthofix.

102. Plaintiff, as a shareholder and representative of Orthofix, seeks restitution from Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**COUNT III**

**Against Individual Defendants for Contribution Under Sections 10(b) and 21D of the Exchange Act**

103. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104. This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Valentine, Bostjancic, and Keran, each of whom is a named defendant in the Securities Action.

105. Orthofix is named as a defendant in the Securities Action, which asserts claims under the federal securities laws for, among other things, violations of Section 10(b) of the Exchange Act. If Orthofix is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of defendants Valentine, Bostjancic, and Keran, as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Action against the Company.

106. As directors and/or officers of Orthofix, defendants Valentine, Bostjancic, and Keran had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about Orthofix and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

107. Defendants Valentine, Bostjancic, and Keran are also liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for

contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

108. Accordingly, Orthofix is entitled to all appropriate contribution or indemnification from defendants Valentine, Bostjancic, and Keran, who are responsible for exposing Orthofix to liability under the federal securities laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Orthofix and that Plaintiff is a proper and adequate representative of the Company;

B. Against Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Individual Defendants' breaches of fiduciary duties;

C. Directing Orthofix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D. Awarding to Orthofix restitution from Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Individual Defendants;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated September ____, 2026.

Respectfully submitted,

PATEL GAINES, PLLC

*s/ Lance H. "Luke" Beshara*

Lance H. "Luke" Beshara
State Bar Number 24045492
221 West Exchange Avenue, Suite 306
Fort Worth, Texas 76164
Telephone: (817) 394-4844
Facsimile: (817) 394-4344
lbeshara@patelgaines.com

SHUMAN, GLENN & STECKER
Rusty E. Glenn (*pro hac* forthcoming)
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

Brett D. Stecker
300 Countryview Drive
Bryn Mawr, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

Counsel for Plaintiff Ryan Smith

**Orthofix Medical, Inc. Verification**

I, Ryan Smith, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: 09/03/2026

Ryan Smith
Ryan Smith (Sep 3, 2026 10:26:32 EDT)

Ryan Smith

# Exhibit A

**SHUMAN, GLENN & STECKER**

Telephone: 303.861.3003
Facsimile: 303.536.7849
www.shumanlawfirm.com

600 17th Street, Ste. 2800 South
Denver, CO 80202

Philadelphia · San Francisco

July 31, 2025

**Via Federal Express**

Michael Finegan
Chair of the Board of Directors
Orthofix Medical, Inc.
3451 Plano Parkway
Lewisville, TX 75056

Re: ***Litigation Demand Pursuant to Delaware Law***

Dear Mr. Finegan:

I write on behalf of Ryan Smith (the "Stockholder"), an owner of the common stock of Orthofix Medical, Inc. ("Orthofix" or the "Company")[1], a Delaware corporation, to demand that the Company's Board of Directors (the "Board")[2] commence an independent investigation into potential wrongdoing by the members of Management.[3]

Specifically, the Board must undertake an independent, good-faith investigation into whether any members of Management breached their fiduciary duties by issuing a series of false and misleading statements from October 2022 through September 2023 (the "Relevant Period"), including all statements made in connection with the January 2023 stock-for-stock transaction (the "Merger") by which Orthofix acquired and merged with SeaSpine Holdings Corp. ("SeaSpine"). These apparently false and misleading statements (for a time) concealed the extent of discrimination and misconduct that had been occurring at SeaSpine for years and the roles that

---

1 As used herein, the terms "Orthofix" and the "Company" include all Orthofix employees and directors, as well as all affiliates, joint ventures, and subsidiaries.

2 According to the Company's website, the current Board of Directors (the "Board") consists of yourself, Alan Bazaar, Wayne Burris ("Mr. Burris"), Massimo Calafiore, Vickie Capps, Jason M. Hannon ("Mr. Hannon"), John Henneman III ("Mr. Henneman"), Charles Kummeth, Shweta Singh Maniar ("Ms. Maniar"), and Michael E. Paolucci ("Mr. Paolucci").

3 The current members of the Board, together with certain current or former senior officers and/or directors of the Company, Jon C. Serbousek ("Mr. Serbousek"), Douglas C. Rice ("Mr. Rice"), Keith Valentine ("Mr. Valentine"), John Bostjancic ("Mr. Bostjancic"), Patrick Keran ("Mr. Keran"), Catherine M. Burzik ("Ms. Burzik"), James F. Hinrichs ("Mr. Hinrichs"), Lilly Marks ("Ms. Marks"), John E. Sicard ("Mr. Sicard"), Thomas A. West ("Mr. West"), Kimberley A. Elting ("Ms. Elting"), and Stuart Essig ("Mr. Essig"), are referred to herein as "Management."

Messrs. Valentine, Bostjancic, and Keran (the "Terminated Individuals") played in fostering SeaSpine's hostile and misogynistic workplace -- information which would have been readily available during the due diligence process. Further, the Board must investigate whether Management made materially false and misleading statements about the purported robustness of Orthofix's ethics and compliance program, which in reality was grossly deficient. Finally, the Board must investigate the S-4 registration statement (inclusive of amendments thereto and documents incorporated therein, the "Registration Statement") and related 424B3 prospectus (inclusive of amendments thereto, related prospectuses, and documents incorporated therein, the "Prospectus") (collectively, the "Offering Documents") issued in connection with the Merger and determine whether they contained a series of false statements touting SeaSpine's and Orthofix's complementary cultures of integrity as a basis for the Merger and attesting to the absence of workplace misconduct at SeaSpine. Should the Board's investigation conclude that any members of Management breached their fiduciary duties, the Stockholder demands that the Board institute litigation against such individuals to recover the damages their misconduct has caused the Company.

As a result of the events which give rise to this demand, the Company is currently a defendant in a federal securities fraud class action pending in the U.S. District Court for the Eastern District of Texas, captioned *In re Orthofix Medical, Inc. Sec. Litig.,* Master File No. 2:24-cv-00690 (the "Securities Action"). The operative complaint in the Securities Action was filed on April 17, 2025 (the "Securities Complaint") and is based in part on multiple detailed confidential witness accounts provided by former Orthofix and/or SeaSpine employees ("CWs"), certain of which are referenced herein.

## I. <u>Overview of Management's Alleged Misconduct</u>

### A. A "Merger of Equals" Between Orthofix and SeaSpine

On October 11, 2022, Orthofix, a medical device company focused on orthopedics, and SeaSpine, a medical technology company focused on surgical treatments of spinal disorders, announced plans for a "merger of equals" that would create "a leading global spine and orthopedics company" with "highly complementary portfolios." This announcement came after Orthofix had assured its stockholders that it took a "disciplined" approach to mergers and acquisition activity. On the day the Merger was announced and in the weeks that followed, Orthofix and SeaSpine both touted the Merger to their stockholders, hailing their "complementary cultures," "including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility" (the "Integrity Statement").

Orthofix and SeaSpine also announced the executive leadership team that would lead the combined Company after the Merger. The combined Company would retain the Orthofix name and would be led by Mr. Valentine, who was then serving as President, Chief Executive Officer ("CEO"), and a director of SeaSpine, and would serve in the same roles at Orthofix. Along with Mr. Valentine, Messrs. Bostjancic and Keran, both senior executives at SeaSpine, would serve as Chief Financial Officer ("CFO") and Chief Legal Officer ("CLO"), respectively. Management told

stockholders that Orthofix's post-Merger executive team had been carefully and purposefully vetted, explaining that Messrs. Valentine, Bostjancic, and Keran and other senior executives were "selected based not only on their individual merit but also with consideration for the overall composition of the executive team". On the same day, the two companies issued a press release that touted Mr. Bostjancic specifically, with Mr. Valentine stating that Mr. Bostjancic's "cultural influence" would "benefit the newly combined company" and that he would "ensur[e] accountability across all levels of the organization".

In soliciting votes for the Merger from stockholders, Orthofix and SeaSpine incorporated the Agreement and Plan of Merger by and among Orthofix Medical Inc., Orca Merger Sub Inc., and SeaSpine Holdings Corp., dated October 10, 2022 (the "Merger Agreement") into multiple U.S. Securities and Exchange Commission ("SEC") filings, including the Registration Statement and Joint Proxy/Prospectus. In those SEC filings, the two companies repeatedly "encourage[d]" their stockholders to "read the merger agreement carefully and in its entirety, as it is the legal document that governs the merger." The two companies stressed that the Joint Proxy was "qualified in its entirety" by the "complete text of the merger agreement," telling stockholders they should "rely only on the information contained in or incorporated by reference into" the Joint Proxy to "vote on the SeaSpine merger proposal." The terms of the Merger Agreement included a set of representations from both companies on specific topics that were deemed essential to the Merger. Indeed, the Merger was contingent on the truth of those representations, providing either party the ability to terminate the Merger if those representations proved inaccurate under the terms of the Merger Agreement.

Those terms included specific representations from SeaSpine that it was "in compliance in all material respects" with "all laws" relating to employment, including laws relating to wages, human rights, harassment, discrimination, retaliation in employment, pay equity, and employment equity. SeaSpine also represented that "[n]o allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment," "misconduct," "discrimination," or "similar behavior" had been "made at any time" within the past four years against "any Person" who was an officer, director, manager, or supervisory-level employee, nor were there any allegations that were pending, threatened, or had a "reasonable basis". Finally, SeaSpine represented that it had entered into no settlement agreements that related directly or indirectly to "any Misconduct Allegation" against SeaSpine or any person who was an officer, director, manager, employee, or independent contractor of SeaSpine.

There is strong evidence that the above representations were all false. And this was and is of particular importance to Orthofix and its stockholders, as Orthofix has its own history of discrimination- and harassment-related complaints from female employees, including some that resulted in litigation.

**B. As Alleged in the Securities Complaint Based in Part on Multiple Witness Accounts, Unbeknownst to Stockholders, SeaSpine Had a Longstanding Culture of Discrimination**

Unbeknownst to stockholders, SeaSpine had a longstanding culture of discrimination, bullying, harassment, and excessive drinking that had been fostered and perpetuated by the Terminated Individuals. SeaSpine's culture and the role of the Terminated Individuals is detailed in the Securities Complaint with consistent accounts of first-hand witnesses that are documented in two lawsuits filed by former SeaSpine and Orthofix employees, as well as accounts by nine separate CWs who served as former employees of SeaSpine or Orthofix (or both) from 2012 to 2024. These first-hand accounts are further corroborated by the Terminated Individuals' text messages, some of which were filed in litigation between the Terminated Individuals and Orthofix.

Since as early as 2015, the Terminated Individuals openly fostered a "good old boys club" workplace culture at SeaSpine that promoted discriminatory hiring, promotion, and compensation, widespread harassment and abusive language, and active efforts by the Terminated Individuals and others to conceal the discriminatory practices and hamstring any attempts at accountability. Although women accounted for roughly half of SeaSpine's workforce, SeaSpine's executive leadership was predominantly male, with only one female member of SeaSpine's board and senior leadership. In a class action discrimination lawsuit (the "*Johnson* Action") brought in 2017 by Maryanne Johnson ("Ms. Johnson"), a former human resources ("HR") employee at SeaSpine, Ms. Johnson explained how SeaSpine systematically paid women less than men for the same work. Ms. Johnson and other CWs confirmed in the Securities Complaint that complaints relating to discrimination and harassment went unaddressed. Indeed, while Ms. Johnson reported discriminatory compensation to SeaSpine's male senior leaders, including Mr. Bostjancic and SeaSpine's Senior Director of HR, Dennis Raposa ("Mr. Raposa"), no action was taken. Instead, Mr. Raposa told Ms. Johnson that SeaSpine was not "the right place" for her, reminding her that SeaSpine was "Keith Valentine's company."

The *Johnson* Action resulted in a nearly $1 million settlement for a class of 276 class members, all current or former female SeaSpine employees in California from July 2015 to December 2019. As part of that settlement, SeaSpine agreed on paper to hire an outside vendor to review SeaSpine's work department, identify evidence of potential pay inequity, and overhaul SeaSpine's compensation and titling structures to remediate the discrimination.

As alleged in the Securities Complaint, the Terminated Individuals took active steps to conceal their discriminatory practices and frustrate attempts to enforce SeaSpine's company policies. To conceal SeaSpine's discriminatory compensation, multiple job titles were created for positions that performed substantially the same work. As a result, even though SeaSpine had only 300 employees, it had more than 200 different job titles, which were designed to prevent evidence of pay inequity for employees with the same job title. And according to the account of one of the CWs in the Securities Complaint who served as Vice President of HR (referred to therein as "CW-4"), SeaSpine deliberately altered its employment data to make SeaSpine appear more equitable than it was in practice, providing that altered data to the outside vendor charged with overseeing the pay and equity investigation that resulted from the *Johnson* Action.

Even after the settlement of the *Johnson* Action, the Terminated Individuals' discriminatory misconduct continued. Their primary mechanism for concealing their

discriminatory practices was to ensure that they had ultimate control over SeaSpine's HR department and its investigations, preventing independent investigations and the filing of complaints. According to the operative Securities Complaint, CW-4 explained that the Terminated Individuals consolidated their control over SeaSpine's HR department. Messrs. Valentine and Keran refused to permit HR to conduct any investigations without their sign-off, preventing HR from independently investigating complaints and, in turn, deterring employees from raising concerns. Apart from controlling investigations, CW-4 explained that she was also asked not to report certain incidents and even cover up complaints relating to discriminatory pay and other practices. When CW-4 tried to spearhead efforts that would support women at SeaSpine, she was chastised by Mr. Keran and eventually terminated by Mr. Valentine. Due to frustration by the HR department's lack of independence and ability to investigate complaints, SeaSpine had eight VPs of HR in just three years.

Having cemented their control over HR, Messrs. Valentine, Bostjancic, and Keran were free to continue their hostile and discriminatory practices unchecked. In addition to pay discrimination, the Securities Complaint alleges that Messrs. Valentine, Bostjancic, and Keran also actively engaged in sexual harassment and other misconduct, including "inappropriate relationships" with their executive assistants ("EAs"). For example, it is alleged that Mr. Valentine drunkenly put his hands up the shirt of an EA "in front of a packed room" at a company event, and encouraged and protected a culture of bullying between female employees, led by the Terminated Individuals' EAs.

This purported long-standing, hostile environment prompted Catherine O'Connor ("Ms. O'Connor"), a former SeaSpine attorney from 2018 to 2024, to sue SeaSpine and Orthofix after the Merger, alleging that she experienced sexual harassment, gender discrimination, and retaliation during her employment (which had occurred both before and after the Merger). Among other adverse employment actions, Ms. O'Connor alleged that she had been underpaid since at least January 2022 and that Mr. Keran had informed her in December 2022 that her bonus target was below market.

There were numerous red flags at SeaSpine that Orthofix would have confronted during the due diligence process in connection with the Merger, which should have prompted Orthofix to take a closer look at personnel and HR issues and decline to install the Terminated Individuals into the combined Company's leadership. But Orthofix's cavalier attitude towards HR and personnel issues is not overly surprising, as it is alleged that Orthofix similarly had a deficient HR department and a history of unredressed discrimination, assault, and harassment, per multiple CW accounts in the Securities Complaint.[4]

---

[4] For example, in the Securities Complaint, the CW referred to as "CW-6" describes a "good old boys" network, sexual harassment, and fear of retaliation at Orthofix, while the CW referred to as "CW-7" describes an unaddressed report at Orthofix of sexual harassment, and the CW referred to as "CW-8" states that Orthofix's HR ignored serious misconduct and that the former President of Orthofix Spine habitually sexually assaulted and/or harassed female employees.

**C. The Terminated Individuals Continue to Foster a Discriminatory Culture at Orthofix Following Completion of the Merger**

On January 4, 2023, Orthofix and SeaSpine announced the completion of the Merger, which became effective as of 12:01 AM on January 5, 2023. Relying on Management's assurances of the Merger's value, stockholders of both companies overwhelmingly voted for the Merger. Under the terms of the Merger, all SeaSpine shareholders acquired shares of Orthofix stock.

As alleged in the Securities Complaint, Messrs. Valentine, Bostjancic, and Keran continued to perpetuate SeaSpine's discriminatory culture at Orthofix after the Merger. For instance, Ms. O'Connor has alleged that she worked directly with Mr. Keran to negotiate her salary, but the Terminated Individuals did not take her request for equitable pay seriously. Indeed, as Ms. O'Connor later learned, a text exchange between Messrs. Bostjancic and Keran discussing Ms. O'Connor's request for an equitable salary increase illustrated their dismissive and demeaning attitudes.

Although the Terminated Individuals allegedly continued to foster a discriminatory and hostile culture at Orthofix, Management presented a contrary image of the Company to stockholders during the Relevant Period. For example:

- Management assured stockholders that Orthofix's "fundamental policy" was to conduct its business "in accordance with the highest ethical legal standards" and that it had a "comprehensive compliance" program that promoted "lawful and ethical business practices" and was "designed to prevent and detect violations of applicable federal, state, and local laws," as well as that it "implement[ed] robust risk management programs" (the "Compliance and Ethics Program Statements");

- Management touted that the Company's "key human capital objectives" included "attracting, developing, and retaining top talent" while "integrating diversity, equity, and inclusion principles and practices into our core values" (the "Human Capital Statement");

- Management stated that Orthofix "str[ove] to support [its] teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow their careers" (the "Talent Development Statement"); and

- Management stated that Orthofix "str[ove] to support [its] teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow their careers" (the "Talent Development Statement").

This commitment, Management repeatedly told stockholders, was enforced through Orthofix's Code of Conduct, which "applied to all directors and executive officers" and "all areas of professional conduct," including "workplace conduct". The Code of Conduct included specific terms that prohibited discriminatory treatment, harassment, or the "possession" or "consumption" of alcohol on Orthofix property "before or during the workday." The Code of Conduct also required managers to ensure that "their teams comply with laws, regulations, and policies, and must work to resolve ethical dilemmas," and required all employees and officers to sign a certification that they were "not in violation of any of the policies of the Code of Conduct" and would "abide by and support the policies set forth in the Code of Conduct." According to the Securities Complaint, those policies were repeatedly violated and not sufficiently applied, contrary to what stockholders were led to believe by Management.

**D. Messrs. Valentine, Bostjancic, and Keran Are Terminated "For Cause"**

On September 12, 2023, approximately nine months after the closing of the Merger, Orthofix issued a press release announcing that the Board's independent directors unanimously decided to "terminate" Messrs. Valentine, Bostjancic, and Keran "for cause," as defined in their employment agreements. The press release explained that these terminations resulted from an internal investigation that revealed that the Terminated Individuals had "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." The press release quoted Ms. Burzik, who at that time was serving as Chair of the Board, as stating that "Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind" and that the terminations were "necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders."

Under the terms of the Terminated Individuals' employment agreements, terminations "for cause" required the Board to find that the executives had engaged in both "willful" and "material" misconduct. Indeed, the termination notices sent to each of the Terminated Individuals explained that Orthofix had found the executives had "breached multiple duties, obligations and agreements held with the Company," which included that they had (a) "caused material and demonstrable injury to the Company" as a result of their "commission of willful misconduct" in connection with the performance of their duties, and (b) "committed willful and material violations of applicable Company policies and codes of conduct."

Stockholders were stunned by this announcement and Orthofix's stock price plummeted by more than ***30%***, closing at $13.01 per share on September 13, 2023, wiping out approximately ***$206.5 million*** of market capitalization.[5] Reporting on the news, analysts noted that "[m]uch of the basis of the merger was to bring in SeaSpine's leadership into Orthofix." Indeed, analysts dismissed Orthofix's claims that the terminations were "not specific to company financials" as

---

[5] Orthofix's stock price has still not recovered and currently trades for approximately $11.50 per share.

"positive spin," explaining that "it's hard to separate the public-facing management that investors knew well and the potential impact to the business." Because "Keith Valentine was a well-known entity in the spine market between customers, distributors, and investors," analysts noted that "in the context of integrating two companies, this throws further risk into a successful merger (and sadly gives more ammunition to the adage that 'spine mergers are largely unsuccessful')." Indeed, analysts observed that these terminations were unprecedented in the industry, noting that they could not "recall another managerial change involving 3 senior positions concurrently during our tenure in medtech equity research."

Soon after the terminations, the Terminated Individuals filed several lawsuits in California state court against Orthofix and its Board. One lawsuit alleged, among other things, that Orthofix's Board members defamed the Terminated Individuals when they announced their terminations. In response, Orthofix's Board members filed a Special Motion to Strike the Defamation Complaint, in which the Company provided more details on the background and reasons for the terminations. In the filing, Orthofix explained that in June 2023, the Board received a complaint from the then-President of Orthofix Global Spine about the Terminated Individuals' workplace misconduct, which included "overconsumption of alcohol, regular inappropriate comments, vulgarity, harassment of employees, and disregard of compliance obligations." An internal investigation then "uncovered proof" that the Terminated Individuals "each repeatedly made gross and improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace," often "during meetings and calls while the very individuals that the former executives demeaned were speaking." Orthofix also "discovered evidence that the former executives engaged in significant and repeated bullying and other mistreatment of Orthofix employees, that the culture the three managed demeaned and devalued the contributions of female employees, and that the three executives acted frequently with aggression, and accepted and promoted vulgarity and personal attacks."

**E. The Securities Action**

Based on the events and misconduct described above, Orthofix investors filed the Securities Action against the Company in the Eastern District of Texas. Following the appointment of a lead plaintiff, the operative Securities Complaint was filed on April 17, 2025, and was based in part on detailed CW accounts, certain of which are referenced herein.

The operative Securities Complaint asserts claims against Orthofix, SeaSpine, Mr. Valentine, Mr. Bostjancic, Mr. Keran, Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Burris, Mr. Hannon, Mr. Hinrichs, Ms. Marks, Mr. Paolucci, Mr. Sicard, Mr. West, Ms. Elting, Mr. Essig, Mr. Henneman, and Ms. Maniar for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Mr. Valentine, Mr. Bostjancic, Mr. Keran, Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Burris, Mr. Hannon, Mr. Hinrichs, Ms. Marks, Mr. Paolucci, Mr. Sicard, Mr. West, Ms. Elting, Mr. Essig, Mr. Henneman, and Ms. Maniar for violations of Section 20(a) of the Exchange Act in a systemic fraud via the Company's public SEC disclosures and other public statements.

The Securities Complaint further asserts claims based on the Offering Documents against Orthofix, Mr. Valentine, Mr. Keran, Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Burris, Mr. Hannon, Mr. Hinrichs, Ms. Marks, Mr. Paolucci, Mr. Sicard, Mr. West, Ms. Elting, Mr. Essig, Mr. Henneman, and Ms. Maniar for violations of Section 11 of the Securities Act of 1933 (the "Securities Act), and against Orthofix, SeaSpine, Mr. Valentine, Mr. Keran, Mr. Serbousek, Mr. Rice, Ms. Burzik, Mr. Burris, Mr. Hannon, Mr. Hinrichs, Ms. Marks, Mr. Paolucci, Mr. Sicard, Mr. West, Ms. Elting, Mr. Essig, Mr. Henneman, and Ms. Maniar for violations of Sections 12(a)(2) and 15 of the Securities Act.

The Securities Action remains pending.

## II. <u>Demand</u>

In light of the above facts and events, the Stockholder hereby demands that the Board investigate independently and in good faith which current and former officers and directors of Orthofix (including, but not limited to, those individuals identified herein as the members of Management) breached their fiduciary duties in connection with the events described herein, thus leading to the Company's substantial damages. The Board must further hold any such individuals to account for the damages their fiduciary failures caused the Company.

Failure to address the foregoing will only expose Orthofix to additional liability and embarrassment. This letter is being sent so that, if derivative litigation on behalf of Orthofix becomes necessary, the Board will have been given the first opportunity to commence the demanded litigation itself. Absent prompt action by the Board to obtain recovery of the Company's damages and prevent further damages, we intend to pursue legal redress on behalf of the Stockholder and the Company.

Sincerely,

SHUMAN, GLENN & STECKER

Rusty E. Glenn

Rusty E. Glenn

cc: Richard A. Maniskas, Esq.
Ryan Smith

# Exhibit B

**Potter Anderson & Corroon LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801-6108
302.984.6000
potteranderson.com

Potter Anderson

Michael A. Pittenger
Partner
mpittenger@potteranderson.com
Direct 302.984.6136

September 2, 2025

**VIA E-MAIL & FIRST-CLASS MAIL**

Rusty E. Glenn, Esquire
Shuman, Glenn & Stecker
600 17th Street, Suite 2800 South
Denver, CO 80202
rusty@shumanlawfirm.com

Re: Orthofix Medical, Inc. - Litigation Demand

Dear Mr. Glenn:

Potter Anderson represents Orthofix Medical, Inc. (“Orthofix” or the “Company”). I write in response to your July 31, 2025 letter to Michael Finegan, Chair of the Board of Directors (the “Board”) of Orthofix on behalf of your client, Ryan Smith, whom you identify as an owner of shares of common stock of Orthofix (the “Demand Letter”).

The Demand Letter requests, among other things, that the Board: (i) “undertake an independent, good-faith investigation into whether any members of Management [(as defined in the Demand Letter)] breached their fiduciary duties by issuing a series of false and misleading statements” in connection with the Merger (as defined in the Demand Letter); (ii) “investigate whether Management made materially false and misleading statements about the purported robustness of Orthofix’s ethics and compliance program”; and (iii) “investigate the S-4 registration statement . . . and related 424B3 prospectus . . . issued in connection with the Merger and determine whether they contained a series of false statements . . . .” Demand Letter at 1-2. The Demand Letter further requests that if the Board concludes that members of Management engaged in wrongdoing, it should “institute litigation against such individuals to recover the damages their misconduct has caused the Company” (such action, together with the actions set forth in subsections (i)-(iii) above, the “Demanded Actions”). Id. at 2.

Earlier this year, the Board received a substantially similar demand letter (the "Initial Demand Letter"). The Board reviewed and subsequently met to consider the Initial Demand Letter as well as additional information relevant to choosing the course of action that would be in the best interests of the Company and its stockholders. The Board also took into consideration the existence of pending securities and derivative litigation based on the same alleged statements, omissions, and conduct that were described in the Initial Demand Letter related to, among other things, certain disclosures made by the Company in its public filings.

Specifically, as you are aware, class action litigation is pending in the U.S. District Court for the Eastern District of Texas, alleging violations of federal securities laws, in a case captioned In re Orthofix Medical, Inc. Securities Litigation, Case No. 2:24-cv-00690 (E.D. Tex.) (the "Securities Action"). In addition, Orthofix stockholders have filed stockholder derivative actions purportedly on behalf of Orthofix in the U.S. District Court for the Eastern District of Texas, alleging violations of federal securities law, breaches of fiduciary duty, and other claims, in cases captioned Marti v. Serbousek, et al., Case No. 2:24-cv-00864 (E.D. Tex.) and Vincent v. Serbousek, et al., Case No. 2:24-cv-01058 (E.D. Tex.) (the "Derivative Actions").

Given the pendency of both the Securities Action and the Derivative Actions, the Board determined to defer a decision on the Initial Demand Letter. Furthermore, the Board determined that it would be in the best interests of the Company and its stockholders to form a committee (the "Committee") authorized to monitor developments in the Securities Action and the Derivative Actions and act with respect to the Initial Demand Letter and any similar stockholder demands that the Company may receive on the same subject matter.

The claims asserted in the Securities Action and the Derivative Actions are based on the same alleged statements, omissions, and conduct described in the Demand Letter. A copy of the Demand Letter was provided to each member of the Committee. The Committee met to discuss the Demand Letter and has determined that it is not presently in the best interests of the Company and its stockholders to undertake the demanded investigation, as doing so would be premature, would be highly prejudicial to the Company's ability to respond effectively to, and defend itself in, the Securities Action, has the potential to harm the Company, and has the potential to be an inefficient and wasteful use of the Company's resources. To launch an investigation of the type requested in the Demand Letter at the present stage of the Securities Action and the Derivative Actions would also be premature because, among other reasons, the scope of harm (if any) that the Company has allegedly suffered, or will suffer, cannot presently be determined. As you are

likely aware, the defendants (including the Company) have moved to dismiss the Securities Action.

Moreover, in the Securities Action, where the Company is a defendant, the Company intends to defend itself against the plaintiffs' claims. Conducting an investigation and commencing litigation, at this time, has the potential to undermine the Company's ability to successfully defend itself in the Securities Action and thus harm the Company. By taking the actions requested in the Demand Letter, the Company may be required, by way of example, to make implicit admissions before the Securities Action has concluded, which could profoundly impair the Company's efforts to defend and/or favorably resolve the Securities Action. Conducting a separate, parallel investigation at this time would also be duplicative and inefficient while the Securities Action and related Derivative Actions remain pending. It would also be disruptive to management's focus on operations and would result in additional costs and expenses to the Company that might ultimately prove unnecessary depending on developments in the Securities Action and related Derivative Actions, including costs associated with advancement and indemnification rights.

In addition, the resolution of the pending motion to dismiss and other developments and rulings in the Securities Action could importantly inform an ultimate decision of whether it is in the Company's and its stockholders' best interests to pursue the types of actions contemplated by the Demand Letter. For example, the facts developed in, and resolution of, the Securities Action can be expected to cast light on (if not definitively resolve): (i) whether or not any wrongdoing occurred on the part of any individuals; (ii) the amount of any resulting damages to the Company, if any; and (iii) the Company's potential indemnification obligations to individuals.

Finally, the Derivative Actions are in their infancy, and no responsive pleading or motion to dismiss has yet been filed. The Company anticipates those actions (which have been consolidated) will be stayed pending developments in the Securities Action. While the Committee strongly believes that the complaints in the Derivative Actions fail to allege any basis to suggest that the Board is incapable of considering a litigation demand, the Committee also believes that expending Company resources on the Demanded Actions now is not efficient or in the best interests of the Company and its stockholders for the reasons explained above and given that the court presiding over the Derivative Actions has not yet ruled on the issue of demand excusal.

Upon due consideration of relevant information, including but not limited to the above-described considerations, and consistent with the Board's determination with respect to the Initial Demand Letter, the Committee has determined, in an exercise of its considered business judgment, that it is not in the best interests of the Company and its

stockholders to commence a separate investigation or to undertake the other Demanded Actions, including initiating litigation, at this time. To be clear, the Committee is not rejecting or refusing the Demand Letter. The Committee will continue to monitor the pending Securities Action and related Derivative Actions and will take any action it determines to be necessary or appropriate to safeguard the rights and interests of the Company and its stockholders as those matters proceed. The Committee or the Board may take any of the Demanded Actions or other actions in the future, if warranted in light of future developments.

As the Committee continues to monitor the Securities Action and the Derivative Actions, we will advise you of any material updates or developments relevant to the Demand Letter. In the meantime, please feel free to send to me any additional details in the possession of you or your client that you believe may be relevant to the accusations contained in the Demand Letter and the Committee's ongoing monitoring of the situation. In addition, the Company requests that you provide evidence of your client's ownership of Orthofix stock, including the date or dates of purchase.

Nothing in this letter shall be construed as agreement with the Demand Letter's assertions or proposed courses of action, or with the views expressed in the Demand Letter. The Company reserves all other rights and defenses in response to the Demand Letter.

Should you have any questions about the foregoing, please do not hesitate to contact me.

Sincerely,

Michael A. Pittenger

Michael A. Pittenger

# Exhibit C

**Thursday, September 3, 2026 at 9:09:40 AM Mountain Daylight Time**

| | |
|---|---|
| **Subject:** | Re: Orthofix Medical, Inc. - Litigation Demand Letter - Ryan Smith |
| **Date:** | Monday, June 1, 2026 at 1:02:09 PM Mountain Daylight Time |
| **From:** | Brett Stecker |
| **To:** | Pittenger, Michael A., oarasim@potteranderson.com |
| **CC:** | Rusty Glenn |
| **Attachments:** | image001.png, image002.jpg |

In the last sentence of my email, August 1, 2025 is stated in error. It should be August 1, 2026. Thanks.

# Exhibit C

**From:** Brett Stecker <brett@shumanlawfirm.com>
**Date:** Monday, June 1, 2026 at 2:58 PM
**To:** "Pittenger, Michael A." <mpittenger@potteranderson.com>, "oarasim@potteranderson.com" <oarasim@potteranderson.com>
**Cc:** Rusty Glenn <Rusty@shumanlawfirm.com>
**Subject:** Re: Orthofix Medical, Inc. - Litigation Demand Letter - Ryan Smith

Counsel:

As you know, we represent Ryan Smith, a current Orthofix Medical, Inc. stockholder who issued a litigation demand dated July 31, 2025 under Delaware law (the "Demand") to Orthofix's Board of Directors. In the Demand, our client demanded that the Board commence an independent investigation in good faith into alleged misconduct by certain current and former Orthofix officers and directors (each of whom was identified in the Demand, and referred to collectively as "Management"), and bring claims on behalf of Orthofix against the members of Management for their breaches of fiduciary duty and other wrongdoing which damaged the Company.

The Demand alleges that the members of Management breached their fiduciary duties by, among other things, issuing a series of false and misleading statements beginning in October 2022. As alleged in the Demand, the truth did not emerge until September 12, 2023, when Orthofix issued a press release announcing the termination of certain members of Management after it was determined that those individuals "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." This September 12, 2023 date is highly relevant because under Delaware law, the applicable statute of limitations for any claims for breach of fiduciary duty based upon these events would expire 3 years later, on September 12, 2026.

Per your letter dated September 2, 2025, the Board "determined to defer a decision" regarding the Demand and also declined to commence the demanded investigation at that time, in light of the pendency of the Securities Action (which has since been sustained in part) and certain other matters. It is not controversial that directors of a Delaware corporation owe an affirmative duty to protect the interests of the corporation at all times, and that the corporation's claims for relief are valuable corporate assets. We are not aware of the status of the Board's investigation into the allegations raised in the Demand at this time, but having not heard otherwise from you since September 2025, we assume the Board still has not commenced an investigation and still intends to defer a decision indefinitely. In the likely event that the Board will not have completed an independent, good faith investigation into the matters raised in the Demand and taken the actions demanded therein prior to the expiration of the applicable statute of limitations on September 12, 2026, the Board should cause the Company forthwith to enter into agreements

tolling the statute of limitations with each member of Management named in the Demand. We request that the Board provide us with copies of all such executed tolling agreements on or before August 1, 2025, so as to ensure that the Company's valuable claims for relief arising from the allegations set forth in the Demand are preserved.

Brett D. Stecker
SHUMAN, GLENN & STECKER
(303) 861-3003
https://www.shumanlawfirm.com/

---

**From:** "Pittenger, Michael A." <mpittenger@potteranderson.com>
**Date:** Tuesday, September 2, 2025 at 11:38 AM
**To:** Rusty Glenn <Rusty@shumanlawfirm.com>
**Cc:** "Arasim, Olivia C." <oarasim@potteranderson.com>
**Subject:** Orthofix Medical, Inc. - Litigation Demand Letter - Ryan Smith

Mr. Glenn,

Please see the attached correspondence regarding Orthofix Medical, Inc.

Thank you.

Mike Pittenger

**Michael A. Pittenger** | Partner
he / him / his
AMERICAN COLLEGE OF TRIAL LAWYERS

Potter Anderson

Potter Anderson & Corroon LLP | 1313 N. Market Street, 6th Floor |
Wilmington, DE 19801-6108
Office +1 302.984.6136
mpittenger@potteranderson.com | potteranderson.com

The information contained in this email message and any attachments is intended only for the addressee and is privileged, confidential, and may be protected from disclosure. Please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this email message in error, please do not read this message or any attached items. Please notify the sender immediately and delete the email and all attachments, including any copies. This email message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which they are received and opened. However, it is the responsibility of the recipient to ensure that the email and any attachments are virus-free, and no responsibility is accepted by Potter Anderson & Corroon LLP for any loss or damage arising in any way from their use.

# Exhibit D

**Potter Anderson & Corroon LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801-6108
302.984.6000
potteranderson.com

Potter Anderson

Michael A. Pittenger
Partner
mpittenger@potteranderson.com
Direct 302.984.6136

June 8, 2026

**VIA E-MAIL & FIRST-CLASS MAIL**

Brett D. Stecker, Esquire
Shuman, Glenn & Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
brett@shumanlawfirm.com

Re: Orthofix Medical, Inc. - Litigation Demand

Dear Mr. Stecker:

I write in response to your June 1, 2026 email correspondence and in furtherance of my September 2, 2025 correspondence on behalf of Orthofix Medical, Inc. (the "Company").[1]

Your email correspondence requests that "the Board . . . cause the Company forthwith to enter into agreements tolling the statute of limitations with each member of Management (as defined in the Demand Letter) named in the Demand [Letter]" and that "the Board provide . . . copies of all such executed tolling agreements on or before August 1, 2026, so as to ensure that the Company's valuable claims for relief arising from the allegations set forth in the Demand [Letter] are preserved." (06/01/26 Email Correspondence).

I have previously explained the decision of the Board of Directors of the Company (the "Board") to defer its decision regarding the Demanded Actions, and as set forth in my September 2 letter, the Board formed a committee (the "Committee") authorized to monitor developments in the Securities Action and the Derivative Actions and act with respect to stockholder demands that the Company may receive on the same subject matter. (9/02/25

[1] Capitalized terms used in this letter have the same meaning as in my September 2, 2025 letter unless otherwise defined herein.

Letter at 2). The Committee subsequently determined to request tolling agreements from each of the persons identified in the Demand Letter as "Management" (Demand Letter at 1) and additional persons the Committee considered.

I am writing to inform you that since my last correspondence, the following individuals have signed a tolling agreement: (i) Jon C. Serbousek; (ii) Douglas C. Rice; (iii) Catherine M. Burzik; (iv) James F. Hinrichs; (v) Lilly Marks; (vi) John E. Sicard; (vii) Thomas A. West; (viii) Kimberley A. Elting; (ix) Wayne Burris; (x) Jason M. Hannon; (xi) John B. Henneman III; (xii) Shweta Singh Maniar; (xiii) Michael E. Paolucci; and (xiv) Stuart Essig. The following individuals have declined to sign a tolling agreement: (i) Keith Valentine; (ii) John Bostjancic; and (iii) Patrick Keran.

In view of the pendency of the Derivative Actions (which name Messrs. Valentine, Bostjancic, and Keran as defendants and assert substantially the same claims as the Demand Letter), as well as all of the other factors referenced in my prior correspondence, the Committee has determined that it remains in the best interests of the Company to continue to defer any action with respect to investigating, or initiating a lawsuit against, the individuals named in the Demand Letter.

As the Board and the Committee continue to monitor the Securities Action and the Derivative Actions, we will advise you of any material updates or developments. In the meantime, please feel free to send to me any additional details in the possession of you or your client that you believe may be relevant to the matters addressed in the Demand Letter and the Board's and Committee's ongoing monitoring of the situation.

Nothing in this letter shall be construed as agreement with the Demand Letter's assertions or proposed courses of action, or with the views expressed in the Demand Letter or your June 1, 2026 email correspondence. The Company reserves all other rights and defenses in response to the Demand Letter.

Should you have any questions about the foregoing, please do not hesitate to contact me.

Sincerely,

Michael A. Pittenger

Michael A. Pittenger

MAP
cc: Andrés Cedrón, Esq., Chief Legal Officer
Brian C. O'Fahey, Esq.